MONCURE, P.
This case now comes up for decision on a rehearing granted on a single point, viz: as to the effect of the discharge in bankruptcy of Griffith D. Neal in bar of the demand preferred against him in this cause. It has been ingeniously and elaborately argued by counsel, and, my opinion upon it, in addition to what is said on the same subject, in the opinion of the court already delivered in the case, is as follows:
Neal was decreed to. be liable for the demand, on the ground that he fraudulently participated in a devastavit *committed by Edmund Fitzgerald, executor of William Fitzgerald, in the sale of certain bonds due to the said testator’s estate, and payable to the said executor as such, which bonds were purchased of the said executor by the said Neal at a heavy discount, not warranted by any emergency of the estate; the proceeds of which discount were converted and applied by the said executor to his own use.
The only ground on which a purchaser can be made liable in such a case, according to the authorities referred to in the said opinion, is that of fraud. By fraudulent^' participating in the devastavit of an executor he commits a fraud, which makes him liable for the value of the wasted assets to those who are injured by the waste.
Neal has been declared a bankrupt, and has received a certificate of discharge in bankruptcy, which he contends entitles him to protection from this demand.
On the other side, it is contended that this case comes within the 33d section of the act of bankruptcy of 1867, which provides, “that no debt created by the fraud or embezzlement of the bankrupt, or by his defalcation as a public officer, or while acting in any fiduciary character, shall be discharged under this act.” The debt in this case having been created by the fraud, and only by the fraud of the bankrupt, it is contended that the case comes within the literal terms of the act of congress.
In reply to this view, it is contended in behalf of Neal, that though the debt was created literally bj' the fraud of the bankrupt, yet it was not such a fraud as the act of congress contemplates. It was only an implied or constructive fraud, and not an express or actual fraud, which latter alone, it is contended, is within the contemplation of the act.
*For this court so to construe the act, would be, I think, to take great liberty with its language, and would be judicial legislation. There is nothing in the act to warrant such a limitation of the *529 meaning- of a plain word, which congress did not see fit to limit in terms, as it might easily have done, and no doubt would have done, if it had intended to use the word in a limited sense. Having used the word generally, I think it ought to be construed in its general sense, and as embracing both actual and constructive fraud. They belong to the same family, and differ only in degree. Thej- both possess one common feature of criminality or culpability. It could not have been contemplated that the court should, in every case, have to en-quire into and ascertain the degree of the fraud, in order to determine whether it comes within the meaning of the 33d section of the act of bankruptcy. Congress would have said “actual fraud,” if it had so intended, in contradistinction to “constructive fraud;” but it seems not to have contemplated any such distinction or classification.
It is argued by the learned counsel for Neal, that because the words, “while acting in any fiduciary character” in the said section have been construed not to include an implied or constructive trust, therefore the word “fraud,” in the same section, should be construed not to include an implied or constructive fraud. But this, I think, is plainly a non sequitur.
The words, “while acting in any fiduciary character” or “capacity,” occurred in the bankrupt act of 1841, and there they followed certain enumerated cases of trust. They were therefore construed, as intended to be confined, to trusts of a like description with those expressly enumerated in the same connection. That construction was well settled while that *act was still in force. In the act of 1867, the general words, “while acting in any fiduciary character” were retained, without repeating all the specific enumerations of trust which had preceded those words in the act of 1841: such as “executor,” “administrator,” “guardian” or “trustee.” The general words having received a settled construction, which made them embrace the said specific enumerations, and at the same time exclude cases of implied or constructive trust, it was considered sufficient to use them alone in the act of 1867, and under that act they have received the same construction which they had received under the act of 1841. They brought that same meaning along with them into the new act, although they did not bring also with them all their old associates.
I have examined the cases referred to by the counsel in support of his argument, except one or two to which I could not obtain access, and they fully confirm my view of the case.
In Chapman v. Forsyth &c., 2 How. U. S. R. 202, decided by the Supreme court of the United States in January 1844, the case arose under the act of 1841, and Mr. Justice McUean delivered the opinion of the court. It was held that a factor who receives the money of his principal is not a fiduciary, within the meaning of the act. “If the act embraces such a debt,” said the court, “it will be difficult to limit such an application. It must include all debts arising from agencies; and indeed all cases where the law implies an obligation from the trust reposed in the debtor. Such a construction would have left but few debts on which the law could operate. In almost all the commercial transactions of the country confidence is reposed in the punctuality and integrity of the debtor, and a violation of these is, in a commercial sense, a disregard *of a trust. But this is not the relation spoken of in the first section of the act. The cases enumerated, ‘the defalcation of a public officer,’ ‘executor,’ ‘administrator,’ ‘guardian,’ or ‘trustee,’ are not cases of implied but special trusts, and the ‘other fiduciary capacity’ must mean the same class of trusts. The act speaks of technical trusts, and not those which the law implies from the contract. A factor is not therefore within the act. ’ ’
In Williamson v. Dickens, 5 Ired. L. R. 259, decided by the Supreme court of North Carolina, in December 1844, the same year in which was decided the case just referred to, the case also arose under the act of 1841, and the opinion of the court was delivered by Nash, J. It was held that the words, “fiduciary character” in the act extend only to special trusts, and not to implied trusts, such as those of agents, factors, &c. “What,” said the judge, “is the fiduciary character or capacity embraced by the act? Does it extend to all cases in which money has been received to the use of another? If so, few debts would be left on which the law would operate; for in all such cases the money is received in faith or trust to be paid over; in other words, in a fiduciary capacity. Surely it could not have been the intention of the national legislature, in passing an act with a view to the relief of bankrupt debtors, to restrict its operation. But the act shows us itself what was meant in the use of the words ‘other fiduciary capacity.’ Taken in connection with the words preceding them, it is evident that only such trusts were meant as are special, and not simply implied, as ‘the defalcation of a public officer,’ or of an ‘executor,’ or ‘administrator.’ Upon the principle then of reddendo singula in singulis, the words ‘other fiduciary capacity’ *must refer to trusts of the same class, to wit, special and not implied trusts.”
These are the only cases to which we are referred arising under the act of 1841. We are referred to several arising under the act of 1867.
In Cronan v. Cotting, 104 Mass. R. 245, decided by the Supreme court of that state in March 1870, the case arose under the act of 1867, and Wells, J., delivered the opinion of the court. It was held that the phrase “fiduciary character” in the act does not include the obligation of a creditor to whom the debtor delivered property, with directions to sell it and apply in satisfaction of the debt so much of the proceeds as might be necessary for the purpose, and to pay over to the debtor a balance of the proceeds *530 of the sale remaining' after such satisfaction; but, it seems, implies a fiduciary relation existing previously or independently of the particular transaction from which the excepted debt arises. “If the phrase, ‘while acting, ’ &c.,” said the court, ‘ ‘be referred to that which immediately precedes, it implies something in the nature of a defalcation. If it be referred to the first branch of the provision, its association with fraud and embezzlement carries the implication of a debt growing out of some fraudulent misappropriation, or at least breach of trust. The debt in this case arose exclusively out of a f single transaction between the parties. Its creation involved no element other than that of contract. The existence of the liability did not spring from any breach of trust. Th e only default consisted in the non-payment of the balance due to the plaintiff after satisfying the purpose of the pledge.” * * “It is simply a debt by contract, like any other which results from the rightful possession of money that belongs to another. We are of opinion, therefore, *that this debt does not come within the meaning of the clause of the bankrupt act above quoted.” The court then referred to the construction which had been put by the Supreme court of the United States on the same words used in the act of 1841,' and concluded that this provision of the act of 1867, was framed in view of and with the intent to adopt the same construction.
In Jones &c. v. Knox, 46 Alab. R. 53, decided in 1871, it was held, among other things, that the liability of the surety of a guardian is not of a fiduciary character from which the discharge in bankruptcy of the surety does not release. The judge in his opinion in this case uses this language, which is quoted in the argument of the counsel for Neal, and on account of which, no doubt, the case is referred to: “The exception from discharge under the thirty-third section of the. law, of debts created by fraud or embezzlement of the bankrupt, or by his defalcation as a public officer, or while acting in any fiduciary character, from its very comprehensiveness, conveys as a reason for the exception the idea of some moral turpitude or culpable neglect of duty.” * * “The sureties of a guardian,” proceeds the judge, “have no control of his conduct. Their obligation is entirely different from his. They undertake to pay money on his account, while he, in addition, engages to be honest and faithful and careful. It is for failure in this latter respect that the law refuses to release him from his debt. The liability of the sureties was not of a fiduciary character.”
In Flanagan v. Cary, 37 Texas R. 67, decided in 1872-3, the case was this': On a replevin bond for certain slaves claimed by heirs adversely to U. and wife, R. became surety for U.’ and wife, and from *them obtained possession of the slaves as an indemnity against his liability on the bond. Pending the litigation between the heirs a-nd R. and wife, R. retained the possession and use of the slaves, and in the meantime purchased from two of the heirs their undivided interests in the slaves. The heirs recovered judgment against U. and wife for the slaves, and demanded them from R., who refused to surrender them except upon terms not conceded by them; and they then (in January 1865) sued R. for the value and hires of the slaves. This suit was protracted until the enactment of the bankrupt law of 1867, under which R. obtained a discharge from his debts, and pleaded the same in bar of the suit. It was held that though R. may have been indebted to the plaintiffs for their proportion of the hires of the slaves which accrued prior to emancipation, yet his indebtedness was not tortious or fraudulent within the meaning of the 33d section of the bankrupt act, and therefore his discharge was a bar to the action. “We see nothing 'in the possession of these slaves on the part of the appellant,” said Walker, J., “which can be regarded as tortious or fraudulent. His possession of the slaves, after, his purchase of an interest in them, was that of one tenant in common. He was liable to his co-tenants for their share of the rents, issues and profits of these slaves, and incurred a debt to them, which might have been proved under the bankrupt law.” “To bring a case within the rule of fraud, as provided in section 33 of the General Bankrupt Haw, it is well stated in Re Whitehouse, 4 B. R. 15, that where the record of the action shows a material and traversable allegation of fraud as its sole foundation, the demand or debt may be said to be one founded in fraud. The liability of 'x'the appellant for the hire of the slaves did not depend upon good or bad faith.”
I have noticed all the cases referred to which are accessible to me, and they are all cases mainly, if not entirely, in regard to the construction of the words, “while acting in a fiduciary capacity,” and having little or no reference to the construction of the word “fraud” in the bankrupt act. Certainly the construction of that word is not directly involved in any of the cases, and it is very clear that not one of them was considered to be a case of fraud, while it was contended in regard to each one of them that it was a case coming within the words, “while acting in a fiduciary capacity” in the meaning of the act. These cases therefore can have little or no application to the question we are now considering as to the true construction of the word “fraud” in the act.
The words “No debt created by the fraud or embezzlement of the bankrupt,” were not in the act of 1841, but were introduced for the first time into the act of 1867; and therefore it is, that we have few or no decisions in regard to the construction of those words, if, indeed, there be any room for construing them. There is a case referred to in 37 Texas 67, 72, supra (in Re Whitehouse, 4 B. R. 15), in which it is said to be stated, as before mentioned, “that where *531 the record of the action shows a material and traversable allegation of fraud as its sole foundation, the demand or debt may be said to be one founded in fraud. ’ ’ This is the only reference I have seen to any case in regard to the meaning of that word in the act, and I have not access to the book containing it. But if that case does not tend to show that the fraud in the case now under consideration comes within the meaning of ^section 33 of the act of 1867, I think it certainly does not tend to show the contrary.
But without referring to any other authorities, I will again refer to one which is a binding authority, and is conclusive of this case in all its aspects — I mean Pinckard v. Woods, &c., 8 Gratt. 140. That was a unanimous decision of this court; Cabell, P., being absent. It is in all its material features as much like this case as one case can well be like another. Baldwin, J., delivered the opinion of the court. It is so strong, and to the point, that I cannot do better than again to repeat some portions of it.
“It is the duty of an executor,” he said, “not to sell, but to collect, the debts due to the estate of his testator, including those arising out of sales of goods made by the executor in the course of his administration; and, if he sells such debts at a price below their value, he thereby commits a devasta-vit, unless he makes it appear that such a sale was manifestly required by the interests of the estate; and this he can never do without showing, in the first place, that the proceeds thereof have been applied to the purposes of the estate. The appropriation by the executor of the proceeds of such a sale, to his own individual uses, presents the case of a fraudulent breach of trust on his part, for which, of course, he is personally liable to creditors, legatees and others, injuriously affected by such improper diversion of the assets. And the purchaser himself, so acquiring such debt at a profit, if he has reason to believe at the time that the same belongs to the estate, and is so disposed of by the executor for his individual uses, thereby concurs in such fraudulent breach of trust by the executor, and therefore incurs the like liability.
“In this case the bonds purchased by the appellant *from Newbill, the administrator with the will annexed of Mary Crafton, deceased, were executed by the obligors for the prices of certain slaves belonging to her estate and sold by the administrator under the authority of her will; which bonds are on their face payable to Newbill, in his character of administrator. The appellant had, therefore, the best reason to believe that the bonds belonged to the testatrix’s estate when he purchased them from the administrator at a discount of eighteen or twenty per cent. ; and, from the profit he was thus allowed to make, he had good reason to believe that the administrator was selling them for his own individual uses; a fact which the result and the condition of the estate have abundantly shown. Under these circumstances it was incumbent upon the appellant to stay his hand until he should ascertain, by the requisite enquiries, that the sale was to be made for the purposes of the estate, and the sacrifice to be incurred indispensably necessary to prevent some still greater sacrifice. He must have known that it was not in the usual course of administration for an executor to sell debts due the estate at a sacrifice, and he was bound to know that such a sale cannot be tolerated unless under very peculiar emergencies of the estate. If he had made the enquiry he would have ascertained that the condition of the estate did not require the sale of the bonds.
“It is no valid defence for the appellant, that at the time he purchased the bonds, it was his belief, and that of the public generally, that the administrator was then in solvent circumstances. Such belief may have induced him to look to the individual responsibility of the administrator as a guarantee against the failure of his speculation, and to that responsibility he must still look, and its having proved abortive, furnishes no reason *for throwing the consequent loss upon those whom he has aggrieved by his intermed-dling with the affairs of the estate, from no other motive than the desire of gain to himself, and careless as to its effects upon the rights of others.
‘ ‘Nor does the statute of limitations afford protection to the appellant; for the appel-lees have no remedy but in equity, which will not allow its application to such a case as this. ”
What was said of Pinekard in that case might, as well, be said of Neal in this. It might well be said to him, “nomine mutato de te fabula narra tur. ”
If the learned judge had been writing an opinion in this case, instead of that, he would have used almost identically the same language that he used in that. The case is an express authority, to show not only that Neal participated in the devastavit, and concurred in the fraudulent breach of trust committed by the executor Pitegerald, and therefore incurred a like liability, but also that he thereby committed a fraud within the meaning of the thirty-third section of the bankrupt act of 1867. And by the express terms of the act, “no debt created by the fraud of the bankrupt shall be discharged under this act. ’ ’ If that be not a fraud in the meaning of the section, I know not what would be. If it be said for Neal that at the time he purchased the bonds, it was his belief and that of the public generally that the executor was then in solvent circumstances, and that a loss to the estate by his future insolvency was not apprehended, the same was said for the appellant in Pinekard v. Woods, and the same answer may be given here that was given there, “It is no valid defense,” &c. If it be said for Neal that he was informed and believed that the estate was indebted to *the executor, who had therefore a right to sell on his own account, it *532 may be answered, as was said in that case, that it was the duty of Neal before he purchased of the executor bonds payable to him ■■as such, at a ruinous sacrifice, to have staid ■his hand and made enquiry, by which he 'would easily have ascertained that the executor was in debt to the estate, and intended to convert the bonds to his own use. If the unfounded belief of Neal, who did not choose to make the proper enquiries to inform himself of the facts, can have the effect to palliate his moral offense, it cannot relieve him of the legal consequences of the fraud of which he is plainly guilty. If there be any error in the opinion heretofore delivered by the court in this cause it is only in calling the fraud a constructive instead of an actual fraud; but surely that is not an error to the prejudice of Neal, who cannot therefore justly complain of it.
I am of opinion that it is a fraud within the meaning of the thirty-third section of the bankrupt act, and therefore that the decree heretofore rendered by this court against him should be re-affirmed.
CHRISTIAN and STAPLES, Js., concurred in the opinion of MONCURE, P.
ANDERSON, J. concurred in the result of it.
BOUEDIN, J. dissented.
The decree on the rehearing was as follows :
The court is of opinion for reasons stated in writing and filed with the record, that the demand recovered against the said Griffith D. Neal by the decree appealed from in this case,, is a debt created by the fraud of the said Neal, within the meaning of the thirty-third ^section of the act of congress approved March 2d, 1867, entitled “an act to establish a uniform system of bankruptcy throughout the United States’ ’; and that the said debt is not discharged under the said act. Therefore it is decreed and ordered that the said decree appealed from, and the decree rendered by' this court in this cause on the 7th day of January 1875, be both re-affirmed upon the point as to the effect of the discharge of the said Neal in bankruptcy in bar of the demand preferred against him in this cause, on which point a rehearing was granted by an order made in this cause on the. 15th day of Eebruary, and such rehearing has been had accordingly.
Which, together with the decree and order of this court above mentioned, is ordered to be certified to the said Circuit court of Pittsylvania county.
The decree of the Circuit court as to Jones’ executors reversed, and affirmed as to Neal and Barksdale.